UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


LEE HUGHES and ELIZABETH           )
LEFTWICH, on behalf of themselves and all)
others similarly situated,                )
        Plaintiffs,                )
                 )
    vs.                )           1:10-1407-SEB-DML
                 )
CHATTEM, INC.,                )
        Defendant.                )


**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

This cause is before the Court on Defendant's Motion to Dismiss Plaintiffs' First

Amended Complaint [Docket No. 26], filed on January 31, 2011, pursuant to Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6).  On November 4, 2010, Plaintiffs, Lee

Hughes and Elizabeth Leftwich ("Plaintiffs"), filed a class action lawsuit against

Defendant, Chattem, Inc. ("Chattem").  Chattem moved to dismiss on December 23,

2010, and Plaintiffs were granted leave to amend their Complaint.  On January 13, 2011,

Plaintiffs filed their First Amended Class Action Complaint praying for injunctive and

declaratory relief and stating the following causes of action:  violation of the Indiana

Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3; breach of implied warranty of

merchantability; intentional misrepresentation; and unjust enrichment.  Chattem has

moved to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction and failure

to state a claim upon which relief can be granted, and Plaintiffs oppose this motion.  For

the reasons detailed below, we GRANT Chattem's Motion to Dismiss without prejudice.

**Factual Background**

Chattem manufactures and markets over-the-counter health care products, including dietary supplements, that are sold by various retailers throughout the United States. Dexatrim Max ("Dexatrim"), one of Chattem's brands, is designed to promote weight loss by enhancing metabolism and reducing appetite. On March 1, 2010, ConsumerLab.com ("ConsumerLab")[1] made public its product report (the "Report") of chromium supplements, which included weight loss formulas. Pls.' Ex. A from Original Compl. According to the Complaint, ConsumerLab conducted testing on Dexatrim and other weight-loss supplements "to determine whether the products met the claims on the labels regarding the ingredients, and moreover, whether the products contained any harmful ingredients." First Am. Compl. ¶ 13. The Complaint further alleges that Dexatrim contained between 1.6 and 3.3 micrograms ("mcg") of hexavalent chromium. *Id.* ¶ 15.[2] The Complaint also cites the Report's claim that ingesting "large amounts" of hexavalent chromium can produce "stomach upsets and ulcers, convulsions, kidney and liver damage, and even death." *Id.* ¶ 16. The Environmental Protection Agency (EPA) recommends enhanced monitoring for hexavalent chromium in drinking water but has

---

[1]ConsumerLab.com, LLC is a privately held New York company. *See About ConsumerLab.com*, CONSUMERLAB.COM, http://www.consumerlab.com/aboutcl.asp (last visited Aug. 10, 2011).

[2]The Report actually indicates that Dexatrim "contained 1.6 to *3.2* mcg . . . per daily serving." Pls.' Ex. A from Original Compl. at 2 (emphasis added).

established no maximum limits for the compound in dietary supplements.[3]

Plaintiff Hughes alleges that he personally purchased Dexatrim approximately three or four times in 2009. Plaintiff Leftwich alleges that she personally purchased Dexatrim "several times since 2008." *Id.* ¶ 21. Both Plaintiffs state that they purchased Dexatrim because of marketing representations that the product was safe for use "and that it did not contain hexavalent chromium, which were false." *Id.* Neither Plaintiff sets out facts describing his or her actual use of the product. *See generally id.* However, they contend that had they known Dexatrim contained hexavalent chromium, they would not have purchased it.

Plaintiffs identify two sources of marketing information upon which they relied in opting to purchase Dexatrim: the product label (Pls.' Ex. A from First Am. Compl.) and the Dexatrim website, which offers weight loss advice. First Am. Compl. ¶ 11. Plaintiffs allege that the icon on the Dexatrim label asserting that Dexatrim is the #1 pharmacist-recommended appetite suppressant "impl[ies] that it is safe." *Id.* ¶ 22. The Complaint also cites Dexatrim's "Frequently Asked Questions" page, which includes the question, "Is Dexatrim safe?" Plaintiffs note that in response to this question, Chattem advises consumers to read warning labels, follow proper dosage instructions, and consult their physician for guidance. *Id.* ¶ 11.

---

[3]*See EPA's Recommendations for Enhanced Monitoring for Hexavalent Chromium (Chromium-6) in Drinking Water*, U.S. ENVTL. PROT. AGENCY, http://water.epa.gov/drink/info/chromium/guidance.cfm (last modified June 30, 2011).

## **Legal Analysis**

### I.  **Standards of Review**

Chattem filed its motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(1) requires dismissal if the court lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Rule 12(b)(6) allows dismissal if the plaintiff's complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In both circumstances, the court accepts all well-pleaded allegations from the complaint as true and makes any reasonable inferences in the plaintiff's favor.  *See Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005) (Rule 12(b)(6) standard); *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002) (Rule 12(b)(1) standard).  When considering a motion to dismiss under Rule 12(b)(1), the district court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993).

By comparison, a party seeking dismissal under Rule 12(b)(6) bears a greater burden.  Courts follow the fairly liberal "notice pleading" standard in considering complaints under Rule 12(b)(6), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  At this stage, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with

the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). Thus, dismissal is only proper when a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court may consider exhibits attached to the complaint as part of the pleadings. *Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1998).

## II. Rule 12(b)(1) Grounds for Dismissal

We first consider Chattem's claim that this Court lacks subject matter jurisdiction over Plaintiffs' claim because Plaintiffs have failed to demonstrate standing to sue. As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing. *Lee v. City of Chi.*, 330 F.3d 456, 468 (7th Cir. 2003). Standing requires a showing of: (1) injury-in-fact, which is an "invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical"; (2) causal linkage between the defendant's conduct and the injury; and (3) likelihood that a favorable decision will remedy the injury. *Tobin for Governor v. Ill. State Bd. of Educ.*, 268 F.3d 517, 527 (7th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Each element of standing "must be supported by more than unadorned speculation." *United States v. Diekemper*, 604 F.3d 345, 350 (7th Cir. 2010).

Proof of injury is arguably the critical element of constitutional standing to sue. The test for injury-in-fact "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v.*

*Morton*, 405 U.S. 727, 734-35 (1972). Thus, Plaintiffs bear the burden of showing not that Chattem violated a duty owed to the public in general, but that Chattem specifically violated a duty owed to them.

Here, Plaintiffs state that their cause of action arises under several state law claims for alleged economic loss. Pls.' Br. at 6-7; First Am. Compl. ¶¶ 23-24. Plaintiffs argue that they have sustained economic injury because,"[a]s a direct result of Chattem's deceptive advertising and marketing scheme, and Plaintiffs' reliance on that scheme, Plaintiffs were deceived into purchasing and spending money on Dexatrim. In exchange for their money, Plaintiffs received something other than what was represented, a product they did not seek." First Am. Compl. ¶ 23. They also claim "a loss of money or property resulting from Chattem's conduct." *Id.* at 24. According to Plaintiffs, if Chattem had indicated "the presence of hexavalent chromium in Dexatrim" on the supplement label, they would not have purchased the product "and exposed themselves to the potential health problems." *Id.*; Pls.' Br. at 6-7. Their Complaint and brief provide a short list of ailments to which hexavalent chromium "has been linked" when ingested in large amounts. Pls.' Br. at 1; First Am. Compl. ¶¶ 16. Additionally, they assert that the State of California is considering limiting hexavalent chromium levels in drinking water to .12 mcg per day–a number based on risk extrapolated from animal research. Pls.' Br. at 11.

This motion turns on the nature of the injuries Plaintiffs claim. Plaintiffs allege a "benefit of the bargain" theory of injury and rely on *Danvers Motor Co. v. Ford Motor*

*Co.*, 432 F.3d 286, 291 (3d Cir. 2005), to stand for the tenet that "[w]hile it is difficult to reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms." Pls.' Br. at 8. We do not dispute this statement, but we note that Plaintiffs have failed to consider more relevant portions of the holding in *Danvers*. Immediately following Plaintiffs' quoted excerpt, the *Danvers* court turned its analysis to situations where a company's business practices "perceptibly impaired" other entities' functions, "resulting in a 'drain on the organization's resources.'" *Danvers*, 432 F.3d at 291 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982)). Specifically, the defendant's conduct directly caused the plaintiffs to spend nearly $1,000,000 "against their will to comply with . . . certification requirements." *Id.* at 290, 292 n.3. The court readily accepted that this degree of verifiable monetary harm "is a classic form of injury-in-fact." *Id.* at 293.

We are unconvinced that Plaintiffs have experienced a financial impairment that resembles in any way the one established by the *Danvers* plaintiffs and accepted by that court. In fact, based on the pleadings, we cannot conclude that Plaintiffs experienced any real "drain" on their personal financial resources that can be attributed to Dexatrim. Assuming a bottle of Dexatrim costs approximately $20 per sixty-count bottle, Plaintiff Hughes suggests that he sustained a loss of around $80. Plaintiff Leftwich asserts only that she purchased Dexatrim "several times," but if we assume that she used one bottle

per month,[4] she would have spent approximately $120 per year on the supplement. *See* Pls.' Br. at 6. Nevertheless, we note that Plaintiffs have not specifically alleged these facts to establish injury, which "must be concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Absent more concrete allegations, we cannot conclude that Plaintiffs' situation truly or fairly compares to the circumstances in *Danvers*.

Plaintiffs also cite several cases from other circuits describing situations in which "benefit of the bargain" claims were sufficient to establish injury-in-fact. Pls.' Br. at 8-9, 9 n.8. In those cases, the plaintiffs alleged that they received products differing in material aspects from the products they reasonably expected. They were successful because they asserted harm in the form of subpar safety and misrepresentations as to product source. More generally, they claimed that "[n]ow that they know the true facts . . . [t]hey cannot obtain the intended bargain or benefit from the goods." *See* Pls.' Br. at 9 n.8 (quoting *In re BPA Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 912 (D. Mo. 2009)). However, Plaintiffs have made no such allegation here. Plaintiffs have neither alleged that the Dexatrim they took caused any physical harm nor even that it did not facilitate their weight loss efforts. They correctly state that hexavalent chromium is harmful in "large amounts," but they do not connect that piece of evidence to any facts personally affecting them. Other than their apparent alarm after reading the Report,

---

[4]We make this assumption based on Dexatrim's product label, which advises consumers to ingest "1 to 2 caplets daily." Pls.' Ex. A from First Am. Compl.

Plaintiffs fall short of establishing a personal stake in this litigation. Plaintiffs do cursorily allege that Chattem "caused . . . [them] to expend money on products which were not safe for consumption," but they have not alleged economic loss traceable to any specific failure of Chattem or any shortcoming in the supplement itself. First Am. Compl. ¶ 41.

Because the Seventh Circuit has not directly addressed the sufficiency of establishing injury in the context of dietary supplements, we look to other jurisdictions for guidance. We find the analysis set forth in the main cases cited by Chattem, *Koronthaly v. L'Oreal USA, Inc.*, No. 07-cv-5588 (DMC), 2008 WL 2938045 (D.N.J. July 29, 2008), *aff'd*, 2010 WL 1169958 (3d Cir. 2010), and *Herrington v. Johnson & Johnson Consumer Cos.*, No. C 09-1597 CW, 2010 WL 3448531 (N.D. Cal. Sept. 1, 2010), both informative and persuasive.

*Whitmore*'s principle–that injury must be qualitatively and temporally concrete–underlies the cases we find persuasive in analyzing Plaintiffs' claims. *Whitmore*, 495 U.S. at 155. In *Koronthaly*, the plaintiff filed suit in the District of New Jersey after the Campaign for Safe Cosmetics (CFS) published a report describing allegedly dangerous lead concentrations in certain L'Oreal lipsticks. *Koronthaly*, 2008 WL 2938045, at *1. The plaintiff was a regular user of these products and was concerned that their lead levels exceeded FDA-established limits for lead in candy.[5] *Id.* Without

_____

[5]Candy was presumably the closest analogue the plaintiff had to lipstick, as the FDA does
(continued...)

describing any particular physical distress, she claimed she was deceived into purchasing a product containing a "known hazardous substance" and was injured by "mere exposure . . . and by her increased risk of being poisoned." *Id.* The court concluded that she had not satisfied the *Whitmore* standard and dismissed her claim, holding that her "allegations of a potential future injury" were "too remote and abstract to qualify as a concrete and particularized injury." *Id.* at *4-5. In affirming the district court, the Third Circuit noted that the plaintiff "asserted only a subjective allegation that the trace amounts of lead in the lipsticks . . . [were] unacceptable to her" and agreed that Article III standing had not been properly established. *Koronthaly*, 2010 WL 1169958, at *2.

*Herrington*'s facts are similar, and its holding accords with *Koronthaly*. There, the plaintiffs read a CFS report stating that certain bath products produced by the defendant contained 1,4-dioxane and formaldehyde, both "probable carcinogens." *Herrington*, 2010 WL 3448531, at *1, *3. They alleged that had the defendants disclosed "'the fact that all ingredients were not proven safe,' they would not have purchased the products." *Id.* at *1 (internal citation omitted). Lacking FDA-established limits for these contaminants, they cited reports discussing their potential effect on water and crop salinity. *Id.* at *3. But the court found this risk too attenuated and held that to the extent any increased risk of harm

⁵(...continued)

not regulate lead levels in cosmetics. *Koronthaly*, 2008 WL 2938045, at *1; *see also Lipstick and Lead*, U.S. FOOD & DRUG ADMIN., http://www.fda.gov/cosmetics/productandingredientsafety/productinformation/ucm137224.htm#q2 (last modified Apr. 15, 2011).

could constitute injury-in-fact for a product-related case, the plaintiffs would have to plead "a *substantially increased* risk of harm and . . . a *substantial probability* of harm with that increase taken into account." *Id.* (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (emphases added)). Moreover, as the plaintiffs had not alleged "that they overpaid . . . or that the products failed to perform," the court did not entertain economic injury claims premised on the "benefit of the bargain" theory. *Id.* at *4.

Additionally, we find the Northern District of Illinois's holding in *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954 (N.D. Ill. 2008), instructive on properly pleading injury-in-fact. In *Frye*, the district court faced a set of facts comparable to those in the record before us. Although this case was dismissed solely pursuant to Rule 12(b)(6), the court criticized the plaintiff's attempts to establish actual injury. *Frye*, 583 F. Supp. 2d at 958-59. The court noted that when a plaintiff pleads economic injury in a product-related case, damages are calculated by analyzing the loss to the plaintiff, not the gain to the defendant. *Id.* at 957. The plaintiff in *Frye*, who claimed she would not have purchased lipstick had she known it contained any lead,

> [did] not allege that she would not have purchased lipstick, that she would have purchased cheaper lipstick, or that the lipstick in question had a diminished value because of the lead. Simply put, there . . . [was] no allegation that the presence of lead in the lipstick had *any observable economic consequences*.

*Id.* at 958 (emphasis added). Ultimately, the court could not ascertain how the plaintiff

had sustained a concrete injury due to the defendant's conduct and dismissed her claim as too speculative.

Just as the plaintiffs in these cases failed to satisfy *Lujan*'s requirement of injury-in-fact, so too do the Plaintiffs here. We recognize that the Report may have alarmed Plaintiffs and similarly concerned health-conscious individuals, but "[f]ear and apprehension about a possible future physical medical consequence of exposure . . . is not enough to establish an injury in fact." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 636 (3d Cir. 1996) (Wellford, J., concurring). Nor does past exposure to wrongful conduct establish standing absent a showing of continuing adverse effects. *Lujan*, 504 U.S. at 563. Here, not only have Plaintiffs neglected to show such adverse effects, but they have also failed to attribute any wrongful conduct to Chattem. Their reliance on the Report as conclusive proof of wrongful conduct and injury is misguided, especially when there are no applicable laws or regulations relating to hexavalent chromium in dietary supplements. Further, Plaintiffs' attempt to bolster the pleadings with a potential California public health goal based on animal testing is entirely unpersuasive. This Court is not obligated to afford such allegations any greater weight and declines to do so here.

At best, Plaintiffs suggest two things: first, that they *may* experience future harm from their limited exposure to hexavalent chromium, and second, that having viewed an Internet-published report by a private company, they now wish they had not purchased Dexatrim. But in our view, neither suggestion comes close to establishing injury-in-fact.

Similarly, Plaintiffs' demand for damages, by itself, does not properly plead injury. *See, e.g.*, *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 320-21 (5th Cir. 2002) (holding that such pleading will not "obscure the fact that . . . [the plaintiffs] have asserted no concrete injury"). We find that Plaintiffs' Complaint against Chattem must be dismissed because they lack standing to bring their claim. For these reasons, Chattem's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) is GRANTED.

## III. Rule 12(b)(6) Grounds for Dismissal

Even if Plaintiffs had established injury sufficient to confer standing, we would nevertheless dismiss this action because they have not stated any claim upon which relief can be granted. "[A]t some point[,] the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 619 (7th Cir. 2007) (quoting *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007)). We preface our analysis by noting that in addressing a Rule 12(b)(6) motion, we treat all well-pleaded factual allegations as true, and we construe all inferences that may reasonably be drawn from these facts in the light most favorable to the non-movant. *Lee*, 330 F.3d at 459; *Szumny v. Am. Gen. Fin.*, 246 F.3d 1065, 1067 (7th Cir. 2001).

Plaintiffs have failed to state a claim for which relief can be granted with regard to all four of the counts listed: violation of the Indiana Deceptive Consumer Sales Act,

breach of implied warranty of merchantability, intentional misrepresentation, and unjust enrichment. We discuss the merits of both sides' arguments relative to each of these counts below.

### A. Indiana Deceptive Consumer Sales Act

Plaintiffs first argue that Chattem is liable for violating the Indiana Deceptive Consumer Sales Act (IDSCA). This argument requires us to answer two questions: (1) whether Chattem is a "supplier" for purposes of the IDSCA, and (2) whether Chattem committed a deceptive act for purposes of the IDSCA.

The IDCSA is designed to protect consumers from deceptive, unconscionable sales acts by suppliers and to encourage suppliers to develop fair consumer sales practices. Ind. Code § 24-5-0.5-1(b) (2011). A "supplier" is defined, in relevant part, as "[a] seller . . . or other person who regularly engages in or solicits consumer transactions," including "a manufacturer . . . whether or not the person deals directly with the consumer." *Id.* § 24-5-0.5-2(a)(3)(A). Plaintiffs contend that Chattem, by manufacturing Dexatrim, falls within this definition. First Am. Compl. ¶ 38. As Chattem is in the business of producing Dexatrim and similar products, we agree. *See Lawson v. Hale*, 902 N.E.2d 267, 272 (Ind. Ct. App. 2009) ("[W]e conclude that a person is a "supplier" with regard to those consumer transactions which are at least indirectly connected with the ordinary and usual course of the person's business.").

Having determined that Chattem is a "supplier" as defined by the IDSCA, we next

address whether Chattem committed a "deceptive act" within the meaning of the statute. Section 24-5-0.5-3(a) of the Indiana Code specifies that "deceptive acts" must be made orally, in writing, or via electronic communication. Plaintiffs point to two "deceptive acts" enumerated in this section; first, they contend that Chattem made representations that Dexatrim, the subject of a consumer transaction, "has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which . . . [Chattem] knows or should reasonably know it does not have." Ind. Code § 24-5-0.5-3(a)(1). Alternatively, they contend that Chattem represented that Dexatrim "is of a particular standard, quality, grade, style, or model, if it is not . . . [and that Chattem] knows or should reasonably know that it is not." *Id.* § 24-5-0.5-3(a)(2). We disagree with Plaintiffs on these points.

Plaintiffs' arguments regarding Chattem's "deceptive acts" appear to focus primarily on Dexatrim's product label and website content. Both arguments are tenuous at best. The portions of the label which, in Plaintiffs' view, deceived them into purchasing an unsafe product are limited to an ingredient list, a "pharmacist-recommended" icon, and statements concerning Dexatrim's intended metabolic effects. *See* Pls.' Ex. A from First Am. Compl. Similarly, the website material does not suggest deception; it actually exhorts each consumer to consider that Dexatrim may not be the right supplement for his or her needs. *See* First Am. Compl. ¶ 11. Taken separately and in combination, we do not agree that this material represents any sponsorship, benefits, or

other attributes that Dexatrim does not have. Pharmacist approval should not be interpreted to imply either perfect safety or guaranteed effectiveness. Additionally, to the extent that Plaintiffs do not direct the Court to a particular referential standard or quality to which Dexatrim should be compared, we find that they have not properly stated a claim for relief under the IDSCA. *See Lawson*, 902 N.E.2d at 273; *McCormick Piano & Organ Co. v. Geiger*, 412 N.E.2d 842, 848 (Ind Ct. App. 1980) ("To be actionable under [Ind. Code § 24-5-0.5-3(a)(2),] the representation must be referential; that is, it must compare the goods to an objective and independent standard.").

## B. Breach of Implied Warranty of Merchantability

Next, Plaintiffs argue that by manufacturing Dexatrim, Chattem impliedly warranted that the supplement would be merchantable and fit for the ordinary purposes for which such a product is used. First Am. Compl. ¶ 46. Specifically, they allege a violation of Indiana Code section 26-1-2-314, which implies that merchantable goods will, at the very least:

> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, are of fair, average quality within the description; and
>
> (c) are fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and
>
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
>
> (f) conform to the promises or affirmations of fact made on the container or label if any.

Ind. Code § 26-1-2-314(2). This warranty "is imposed by operation of law for the protection of the buyer and must be liberally construed in favor of the buyer." *Frantz v. Cantrell*, 711 N.E.2d 856, 859 (Ind. Ct. App. 1999).

Under Indiana law, an action based on breach of implied warranty of merchantability "requires evidence showing not only the existence of the warranty but also that the warranty was broken and that the breach was the proximate cause of the loss." *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009); *see also* Ind. Code § 26-1-2-607(4) ("The burden is on the buyer to establish any breach with respect to the goods accepted."). This Court has previously held that a party stating such a claim must prove that, with regard to this product, (1) there is a standard in the trade and (2) the product did not conform to that standard. *Easyrest, Inc. v. Future Foam, Inc.*, No. 4:06-cv-2-SEB-WGH, 2007 WL 2705582, at *1 (S.D. Ind. Sept. 12, 2007).

Plaintiffs contend that Chattem has breached this warranty because at the time of sale, Plaintiffs "did not receive a product that was safe for consumption and free from hexavalent chromium." First Am. Compl. ¶ 47. Without more, this bare-bones assertion does not satisfy the requirements of Indiana law. We certainly concede that in selling Dexatrim, Chattem warrants to consumers that taking the supplement will "help boost energy, metabolism[, and] reduce hunger." Pls.' Ex. A from First Am. Compl. But we remind Plaintiffs that dietary supplements need not be approved by the FDA. The FDA goes so far as to advise consumers, "Just because you see a supplement product on a store

shelf does NOT mean it is . . . effective."[6]  In any event, Plaintiffs have not argued that

the Dexatrim they purchased was ineffective.  Neither the Complaint nor the briefing

discusses actual *use* of the product or alleges how Dexatrim contributed to any weight

loss efforts.  Plaintiffs do cite a portion of the Report positing that certain ingredients in

Dexatrim are "not known to cause weight loss," but they adduce no evidence that the

supplement failed to meet any controlling standard in the weight loss industry.  Further,

based on the paucity of the facts stated in the Complaint, it is impossible to establish

conclusively whether the product was defective with respect to each individual plaintiff.

Therefore, Plaintiffs' claim of a breach of implied warranty of merchantability cannot

succeed.

### C.  Intentional Misrepresentation

Plaintiffs' third cause of action, asserted independently from the IDSCA, sounds in

fraud.  Federal Rule of Civil Procedure 9(b), which is identical to Indiana Trial Rule 9(B),

requires that "the circumstances constituting fraud . . . shall be specifically averred."  Fed.

R. Civ. P. 9(b); Ind. Tr. R. 9(B).  This rule's heightened pleading standard applies to state

law fraud claims asserted in federal court.  *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d

467, 470 (7th Cir. 1999) (noting that Rule 9(b) requires such pleading "in all civil cases

brought in the federal courts, whether or not the applicable state or federal law requires a

---

[6]*Beware of Fraudulent Weight-Loss "Dietary Supplements*,*"* U.S. FOOD & DRUG
ADMIN., http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm246742.htm (last modified
Aug. 17, 2011).  This webpage merely advises consumers on making informed decisions
regarding dietary supplements.  It does not identify any specific products or ingredients.

higher standard of proving fraud, which sometimes it does and sometimes it does not"). We also note that the Indiana Supreme Court has determined that IDSCA claims sounding in fraud must satisfy Rule 9(b)'s particularity requirements in the pleading stage. *McKinney v. State*, 693 N.E.2d 65, 73 (Ind. 1998).

A plaintiff claiming fraud must engage in "more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate"; his complaint must demonstrate "the who, what, when, where, and how." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotation marks omitted). Plaintiffs alleging fraud under Indiana law must establish the following elements to satisfy this heightened pleading standard: (1) a false statement of present or past material fact; (2) knowledge that the statement, when made, was false or made "recklessly without knowledge of its truth or falsity"; (3) intent to induce another party to act on the statement; (4) actual reliance by the other party; and (5) the proximate result of in injury to the other party. *Craig & Landreth, Inc. v. Mazda Motor of Am., Inc.*, 744 F. Supp. 2d 818, 829 (S.D. Ind. 2010) (citing *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996)). These allegations must appear in the complaint itself. *See MDG Int'l, Inc. v. Australian Gold, Inc.*, No. 1:07-cv-1096-SEB-TAB, 2008 WL 3982072, at *2 (S.D. Ind. Aug. 22, 2008).

Our review of the First Amended Complaint convinces us that Plaintiffs have not complied with the statutory standards for fraud. In fact, they assert little more than the

"who" and the "when" required for this cause of action. *See* First Am. Compl. ¶ 21.

Noticeably lacking is a proper showing of the "what" contemplated by *Borsellino*.

Plaintiffs aver that the intentional misrepresentation is as follows: the Dexatrim product

label "states that Dexatrim contains 'Chromium' and numerous other ingredients but fails

to disclose that it contains chromium hexavalent, thereby misrepresenting that Dexatrim

does not contain chromium hexavalent." *Id.* ¶ 22. However, Plaintiffs concede in their

brief that under *Lawson*, 902 N.E.2d at 274, non-disclosures fall outside the purview of

the IDSCA. Pls.' Br. at 14.

Plaintiffs' attempt to salvage this portion of their claim by suggesting other

"affirmative misrepresentations plainly alleged in the [First Amended Complaint]" also

cannot succeed. *Id.* For instance, Plaintiffs point to their statement in the Complaint that

"Chattem promoted Dexatrim as being safe and healthy." *Id.* They also characterize

Dexatrim's labeling and FAQ webpage as affirmative misrepresentations meant to

beguile consumers into buying a hazardous product. Still, we decline to interpret relevant

case law as supporting the notion that, given these facts, Chattem's marketing involved

affirmative misrepresentations. General statements found on product labels and consumer

webpages do not traditionally amount to actionable or constructive fraud under Indiana

law. *See Doe v. Howe Military Sch.*, 227 F.3d 981, 991 (7th Cir. 2000) (declining to

interpret brochures' aspirational statements as affirmative misrepresentations); *Mudd v.*

*Ford Motor Co.*, No. 1:04-cv-465-TS, 2005 WL 2369833, at *4 (N.D. Ind. Sept. 27,

2005) (rejecting fraud claim where the allegedly affirmative misrepresentation "offer[ed] no specifics and [was] too vague to assign any meaning to it"); *Wisconics Eng'g, Inc. v. Fisher*, 466 N.E.2d 745, 756 (Ind. Ct. App. 1984) ("Representations as to value, standing alone, are generally regarded as . . . 'trade talk' and do not constitute fraud.").

Also troubling is Plaintiffs' representation in the briefing that in paragraph 11 of their Complaint, they allege that "Chattem claims that Dexatrim is safe." Pls.' Br. at 14. This representation is incongruent with the actual Complaint text:

> Is Dexatrim safe? . . . . As with all dietary supplements, it is important to carefully follow the recommended dosing and thoroughly read the warning label before starting the regimen. Dexatrim is not an appropriate weight control aid for persons suffering from certain medical conditions. Please see our label information for each specific product (click on links below) and consult your physician for further information.

First Am. Compl. ¶ 11. If Plaintiffs meant to argue that this text affirmatively misstated that "Dexatrim was safe," the place for such argument was in the Complaint. "Under the more rigid rule of Rule 9(b), . . . [such] allegations . . . cannot be supplemented by a responsive brief." *MDG Int'l*, 2008 WL 3982072, at *2 (citing *Kedzierski v. Kedzierski*, 899 F.3d 681, 684 (7th Cir. 1990)).

Moreover, we cannot characterize as an affirmative misstatement "that [Dexatrim's] ingredients include chromium but not hexavalent chromium." Pls.' Br. at 14. Nothing in the Complaint alleges actual facts suggesting that Chattem knew of this supposed contaminant and that, if present, it presented a high probability of injury to

consumers.  The Complaint also does not allege that Chattem either performed studies or

had access to verifiable scientific data alleging the same.  Thus, because Plaintiffs have

failed to establish a key element of fraud under Indiana law, their claim of intentional

misrepresentation must also fail.

### D.  Unjust Enrichment

Finally, Plaintiffs ask this Court to impose a constructive trust on the profits

Chattem received from selling Dexatrim to them.  They argue that this remedy is proper

under the theory of unjust enrichment.  First Am. Compl. ¶¶ 57-58.  Based on the above

arguments, they state that Chattem has profited "under circumstances in which it would

be inequitable for Chattem to be permitted to retain the benefit."  *Id.* ¶ 57.

To prevail on a claim of unjust enrichment, a plaintiff must demonstrate that a

benefit was rendered to another party (the defendant) and that allowing the defendant to

retain the benefit without paying for it would be unjust.  *Bayh v. Sonnenburg*, 573 N.E.2d

398, 408 (Ind. 1991); *Kelly v. Levandoski*, 825 N.E.2d 850, 861 (Ind. Ct. App. 2005).

The key concept underlying unjust enrichment is "the occurrence of a wrong or

something unjust."  *Savoree v. Indus. Contracting & Erecting, Inc.*, 789 N.E.2d 1013,

1020 (Ind. Ct. App. 2003).  Courts generally require that the pleadings state facts

demonstrating an actual wrong or misleading conduct.  *See id.* at 1019 (citing

*Indianapolis Raceway Park, Inc. v. Curtiss*, 386 N.E.2d 724, 727 (Ind. Ct. App. 1979)).

Additionally, although past payment may be relevant to the finding of a wrong, "it does

not necessarily compel a result one way or the other." *Indianapolis Raceway Park*, 386 N.E.2d at 726 n.2.

Plaintiffs maintain that Chattem incurred the benefit of "excessive revenue derived from the sale of Dexatrim" and that it did so by misrepresenting the supplement's safety profile. First Am. Compl. ¶ 57. Although they vaguely assert that Chattem received this benefit "under circumstances in which it would be inequitable" to retain it, they state no particular reason *why* an equitable remedy is necessary. *Id.* In reply, Chattem directs our attention to *Spears v. Metro. Life Ins. Co.*, No. 2:07-CV-88-JVB, 2009 WL 2408928, at *15 (N.D. Ind. Aug. 4, 2009), which forbids such generic allegations. Def.'s Br. at 15. We note that in *Spears*, the plaintiffs alleged that the defendant had received "fees, costs, and expenses related to the plaintiffs' investment of monies" and that "it would be unjust for the defendants to retain the benefits." *Id.* at *14. The court concluded that the plaintiffs did not articulate *what* wrongful benefit inured to the defendants and *why* they should be granted "the extraordinary remedy of an equitable claim for unjust enrichment." *Id.* at *15. Stated otherwise, where it is not obvious that "natural and immutable justice" dictates restitution, unjust enrichment is not available. *See Zoeller v. East Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009).

We find that there is nothing inherently unjust about Plaintiffs paying for dietary supplements they allegedly purchased and consumed. Corrective justice traditionally

dictates a duty to remediate in circumstances where one party has harmed another.[7]  As was the case in *Spears*, Plaintiffs have described isolated economic transactions where although they reasonably expected to pay for Chattem's goods, they are now dissatisfied. But where they fail to allege extraordinary circumstances, much less that they did not receive the benefit of their bargain, we find that an order of unjust enrichment is inappropriate.

## Conclusion

For the reasons detailed herein, Chattem's motion to dismiss Plaintiffs' claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure is GRANTED.  A final judgment WITHOUT prejudice shall issue in accordance with this opinion.

IT IS SO ORDERED.

Date:_____08/31/2011_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[7]*See* Stephen R. Perry, *On the Relationship Between Corrective and Distributive Justice*, *in* OXFORD ESSAYS IN JURISPRUDENCE 239 (Jeremy Horder ed., Oxford Univ. Press rev. ed. 2000).

Copies to:

Thomas W. Hayes
LAW OFFICE OF WILLIAM M KOZIOL
1 Kemper Dr
Long Grove, IL 60049

James H. McFerrin
MCFERRIN LAW FIRM
jhmcferrin@bellsouth.net

Denise Arenth Miller
MILLER & MARTIN PLLC
dmiller@millermartin.com

Michael  Reese
REESE RICHMAN LLP
875 Avenue of the Americas 18th Floor
New York, NY 10001

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Patrick J. Sheehan
WHATLEY DRAKE & KALLAS, LLC
psheehan@wdklaw.com

Robert S. Tellman III

LAW OFFICES OF ROB TELLMAN

2117 Magnolia Avenue So.

Suite 100

Birmingham, AL 35205

Joseph N. Williams

PRICE WAICUKAUSKI & RILEY

jwilliams@price-law.com

Katherine A. Winchester

ICE MILLER LLP

winchest@icemiller.com